## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**JANE S.M. DOE,**

     Plaintiff,

vs.

Case No.  18-cv-
Hon.

**LAWRENCE GERARD NASSAR, JEFFREY KOVAN, D.O., KATHIE KLAGES,  WILLIAM D. STRAMPEL, D.O., DOUGLAS DIETZEL, D.O., BRIAN BRESLIN, JOEL I. FERGUSON, DIANNE BYRUM, MELANIE FOSTER, DAN KELLY, MITCH LYONS, BRIAN MOSALLAM, GEORGE PERLES, BROOKE LEMMEN, D.O., GARY E. STOLLAK,** *and* **DESTINY TEACHNOR-HAUK,** *in their personal and official capacities*,

     Defendants.

_____

**DEBORAH GORDON LAW**
Deborah L. Gordon (P27058)
Attorney for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com

_____

     **A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in Western District of Michigan – Southern Division, where it was given docket number 1:17-cv-00029-GJQ-ESC and was assigned to Judge Gordon J. Quist.  The action remains pending.**

1

## COMPLAINT AND JURY DEMAND

Now comes Plaintiff Jane S.M. Doe, by and through her attorneys, Deborah Gordon Law, and hereby alleges and states as follows:

### I.       PRELIMINARY STATEMENT AND INTRODUCTION

1.     This is a civil action for declaratory, injunctive, equitable, and monetary relief for injuries sustained by Plaintiff as a result of the acts, conduct, and omissions of Defendants and their respective employees, representatives, and agents, relating to sexual assault, abuse, molestation, and non-consensual sexual touching and harassment by Defendant Nassar against Plaintiff, a female, who was a minor at the time the sexual assaults took place.

2.     Plaintiff was a promising young athlete beginning her college sports career as a gymnast. She was a minor seeking treatment for back pain.

3.     Defendant Nassar came highly recommended to Plaintiff as a renowned orthopedic sports medicine physician, purportedly well-respected in the sports medicine community, specifically the gymnastics community.

4.     Plaintiff and her parents had no reason to suspect Defendant Nassar was anything other than a competent and ethical physician.

5.     During the early to mid-1990s, Defendant Nassar was associated with and worked for the MSU Sports Medicine Clinic in his role as a medical student resident and fellow.

6.     From approximately 1996 to 2016, Defendant Nassar worked for MSU in various positions and capacities.

7.     These positions afforded him unfettered access to young female athletes including Plaintiff through the Sports Medicine Clinic at MSU.

8.     For approximately four years during the mid- to late 1990s, under the guise of treatment, Defendant Nassar sexually assaulted, abused, and molested Plaintiff, who was a minor during at least a portion of this time, by nonconsensual digital vaginal penetration and other nonconsensual sexual conduct and without the use of gloves or lubricant.

9.     Between 1992 and 2016, under the guise of medical study and medical treatment, Defendant Nassar sexually assaulted, abused, and molested his patients, many of whom were minors during at least some portion of this time, by nonconsensual vaginal and anal digital penetration or by rubbing their breasts, and without the use of gloves or lubricant.

10.     Nassar's victims sought treatment for various pain and functional complaints like Plaintiff, such as back pain, neck pain, shoulder pain, knee pain, hip pain, foot pain, and other similar injuries and conditions.

11.     In 1997 or 1998, an athlete reported to MSU gymnastics coach Kathie Klages her concerns regarding Defendant Nassar's "treatments," but Klages

dissuaded the athlete from completing a formal report by warning her that a report could have serious, negative consequences for both her (the athlete) and Nassar.

12.     Because Defendants took no action to investigate the 1997 complaint, and took no corrective action, Plaintiff was sexually assaulted, abused, and molested by Defendant Nassar by nonconsensual vaginal penetration and other nonconsensual sexual conduct and without the use of gloves or lubricant.

13.     Over the course of approximately four years mid-1990s, Plaintiff was repeatedly assaulted at the MSU Sports Clinic on MSU's Campus.

14.     MSU holds its Sports Clinic out as a fee-for-service clinic that is open to the public at large.

15.     Through his positions with MSU, his notoriety, and support by the gymnastics community, including MSU, Defendant Nassar used his position of authority as a medical professional to abuse Plaintiff without any reasonable supervision by MSU.

16.     Defendant Nassar carried out his "treatment" of Plaintiff without explaining it or obtaining her or her parents' consent.

17.     All of Defendant Nassar's acts were conducted under the guise of providing medical care at MSU's Sports Medicine Clinic.

18.     The failure to give proper notice or to obtain consent for the purported "treatment" from Plaintiff or her parents robbed them of the opportunity to reject the "treatment."

19.     Defendant Nassar used his position of trust and confidence in an abusive manner causing Plaintiff to suffer a variety of injuries including shock, humiliation, emotional distress and related physical manifestations thereof, embarrassment, loss of self-esteem, disgrace, and loss of enjoyment of life.

20.     In September 2016, a story was published regarding a complaint filed with Defendant MSU's Police Department titled, "Former USA Gymnastics Doctor accused of Abuse," which included other women's allegations against Defendant Nassar.

21.     Following the September 2016 publication, numerous other victims began coming forward after recognizing that they were victims of sexual abuse at a time when most of them were minors.

22.     Plaintiff was forced to relive the trauma of the sexual assaults, which ultimately prompted her to come forward.

23.     As early as 1997, representatives of MSU were made aware of Defendant Nassar's conduct, yet failed to appropriately respond to allegations, resulting in the sexual assault, abuse, and molestation of Plaintiff through approximately 1998.

5

24.     Defendants' deliberate indifference before, during, and after the sexual assault, abuse, and molestation of Plaintiff was in violation of 42 U.S.C. §1983, as well as other Federal and State laws.

25.     Defendants' failure to properly supervise Defendant Nassar was in violation of Michigan's common law.

26.     In late November 2016, Defendant Nassar was arrested and charged in Ingham County, Michigan on three charges of first-degree criminal sexual conduct with a person under 13.

27.     In mid-December 2016, Defendant Nassar was indicted, arrested, and charged in Federal Court in Grand Rapids, Michigan on charges of possession of child pornography and receipt/attempted receipt of child pornography.

28.     The acts, conduct, and omissions of Defendants and their policies, customs, and practices with respect to investigating sexual assault allegations severely compromised the safety and health of Plaintiff and an unknown number of individuals, and have resulted in repeated instances of sexual assault, abuse, molestation of Plaintiff by Defendant Nassar, which has been devastating to Plaintiff and her family.

29.     This action arises from Defendants' blatant disregard for Plaintiff's federal and state rights, and Defendants' deliberately indifferent and unreasonable response to physician-on-patient sexual assault, abuse, and molestation.

## II.    JURISDICTION AND VENUE

30.    This action is brought to redress the deprivation of Plaintiff's federal civil rights, including her constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

31.    Subject matter jurisdiction is founded upon 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

32.    Subject matter jurisdiction is also founded upon 28 U.S.C. § 1343, which gives district courts original jurisdiction over any civil actions authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege, or immunity secured by the Constitution of the Unites States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

33.    Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a) to hear and decide claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

34.     The claims are cognizable under the United States Constitution, 42 U.S.C. § 1983, 42 U.S.C. § 18116, and under Michigan law.

35.     The events giving rise to this lawsuit occurred in Ingham County, Michigan which sits in the Southern Division of the Western District of Michigan.

36.     Venue is proper in the United States District Court for the Western District of Michigan, pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claim occurred.

## III.    PARTIES AND INDIVIDUALS

37.     Plaintiff Jane S.M. Doe is a female and resident of Michigan. She was a minor during the time that she was sexually assaulted by Defendant Nassar.

38.     Michigan State University ("MSU") is a public university organized under the laws of Michigan.

39.     The Michigan State University Board of Trustees of ("MSU Trustees") is the governing body for MSU.

40.     Defendant Brian Breslin has served on the MSU Board of Trustees since 2011, and is a resident of Michigan.

41.     Defendant Joel I. Ferguson has served on the MSU Board of Trustees since 1986, and is a resident of Michigan.

42.     Defendant Dianne Byrum has served on the MSU Board of Trustees since 2008, and is a resident of Michigan.

8

43.     Defendant Melanie Foster has served on the MSU Board of Trustees since 2004, and is a resident of Michigan.

44.     Defendant Dan Kelly has served on the MSU Board of Trustees since 2017, and is a resident of Michigan.

45.     Defendant Mitch Lyons has served on the MSU Board of Trustees since 2011, and is a resident of Michigan.

46.     Defendant Brian Mosallam has served on the MSU Board of Trustees since 2013, and is a resident of Michigan.

47.     Defendant George Perles has served on the MSU Board of Trustees since 2007, and is a resident of Michigan.

48.     M. Peter McPherson served as President of Defendant MSU from approximately 1993-2004.

49.     Lou Anna K. Simon is the immediate past President of Defendant MSU, appointed in approximately January 2005. Prior to her appointment as President, Ms. Simon held several administrative roles including assistant provost for general academic administration, associate provost, and provost and vice president for academic affairs during her career with MSU.

50.     Lou Anna K. Simon resigned her position as President of Defendant MSU on January 24, 2018.

51.    John Mathias Engler is the former Governor of the State of Michigan and is currently serving as interim President of Defendant MSU.

52.    Mark Hollis is the immediate past Athletic Director of Defendant MSU.

53.    Bill Beekman is currently serving as interim Athletic Director of Defendant MSU.

54.    Lawrence "Larry" Nassar was a Doctor of Osteopathic Medicine and, at all relevant times, resided in Michigan. Nassar is currently incarcerated and, upon information and belief, is in the custody of the Federal Bureau of Prisons.

55.    Defendant William D. Strampel, D.O. ("Defendant Strampel") was the Dean of the College of Osteopathic Medicine at Michigan State University serving as Dean since approximately April 2002 and as Acting Dean between December 2001 and April 2002. Upon information and belief, in December 2017, Defendant Strampel stepped down from his role as Dean of the College of Osteopathic Medicine for "medical reasons," but Defendant Strampel will remain on the faculty of MSU's College of Osteopathic Medicine.

56.    Defendant Jeffrey Kovan, D.O., ("Kovan") served as the Director of Sports Medicine at MSU-Kalamazoo Center for Medical Studies from 1991 to 1995, and thereafter as the Director of Sports Medicine at MSU.

10

57.     Kovan remains the Director of Sports Medicine and head team physician for MSU.

58.     Defendant Douglas Dietzel, D.O. ("Defendant Dietzel") is the Clinical Director of MSU Sports Medicine and Team Orthopedic Surgeon for MSU Department of Intercollegiate Athletics serving as Clinical Director of MSU Sports Medicine since approximately 2004.

59.     Defendant Brooke Lemmen, D.O. ("Defendant Lemmen") is or was a practicing physician with MSU Sports Medicine from approximately 2010 to 2017.

60.     Defendant Kathie Klages ("Klages") was the head coach of the Michigan State University Gymnastics Program until her suspension and resignation in early 2017; she also conducted gymnastics classes and programs for children and young adults not on the varsity gymnastics team.

61.     Defendant Gary E. Stollak ("Defendant Stollak") was a professor in the clinical program within the Michigan State University Department of Psychology.

62.     Defendant Destiny Teachnor-Hauk ("Defendant Teachnor-Hauk") is or was an athletic trainer for Defendant MSU for various sports including, but not limited to, softball, track and field, gymnastics, rowing, and volleyball.

63.     Defendant Teachnor-Hauk regularly referred MSU student athletes to Defendant Nassar for medical treatment.

11

64.    The  individual  Defendant  MSU  Trustees,  Defendant  Nassar, Defendant  Stollak,  Defendant  Strampel,  Defendant  Kovan,  Defendant  Klages, Defendant  Dietzel,  Defendant  Lemmen,  and  Defendant  Teachnor-Hauk  are hereinafter  collectively  referred  to  as  the  MSU  Defendants  unless  otherwise specified.

65.     At  all  relevant  times  the  MSU  Defendants  maintained  employment and offices at Defendant MSU in East Lansing, Michigan.

66.     At  all  relevant  times,  the  MSU  Defendants  acted  within  the  scope of their employment or agency with MSU.

67.     At  all  relevant  times,  the  MSU  Defendants  were  acting  under  color of  state  law,  namely  under  color  of  statutes,  ordinances,  regulations,  policies, customs, and/or usages of the State of Michigan and/or Michigan  State University.

68.     At  all  relevant  times  the  MSU  Defendants  maintained  employment and offices at Defendant MSU in East Lansing, Michigan.

69.    United  States  of  America  Gymnastics  (hereinafter  "Defendant USAG")  was  an  continues  to  be  an  organization  incorporated  in  Indiana, authorized  to  conduct  business  and  conducting  business  throughout  the  United States, including but not limited to Michigan.

## IV.    GENERAL ALLEGATIONS

### A.    Defendant Nassar Worked for and Under the Aegis of Defendants

70.     In 1984, Lawrence Gerard Nassar ("Nassar"), while still an undergraduate, began volunteering as a trainer at Great Lakes Gymnastics in Lansing, Michigan.

71.     In 1986, Nassar began volunteering with USA Gymnastics ("USAG") as an athletic trainer.

72.     Around the same time, he began serving as an athletic training for the Michigan State University Athletics Department.

73.     In 1993, Nassar received his D.O. degree from MSU.

74.     Between 1993 and 1997, Nassar completed his medical residency at St. Lawrence Hospital in Lansing, Michigan. During this time he was associated with and worked for the MSU Sports Medicine Clinic, upon information and belief, as a resident and/or fellow.

75.     For over 20 years, Defendant MSU's Sports Medicine Clinic has provided health care to MSU student athletes and the general public.

76.     When the MSU Defendants operated the MSU Sports Medicine Clinic and provided medical services to Plaintiffs and other, they were acting as an arm of the state.

77.     The MSU Sports Medicine Clinic charged patients, including Plaintiffs, for their receipt of medical services.

78.     Charging Plaintiffs (and others) and billing insurance companies for medical services is an activity proprietary in nature.

79.     The MSU Defendants charged fees comparable to specialists for the services provided at the MSU Sports Medicine Clinic.42

80.     The MSU Sports Medicine Clinic engaged in proprietary functions by entering into the business of providing medical services for the primary purpose of raising funds and making a profit for the MSU Defendants.

81.     The MSU Sports Medicine Clinic cannot be normally supported by taxes and fees.

82.     In approximately 1996, Nassar received a faculty appointment to work at MSU in a variety of clinical capacities, including but not limited to:

a.     Faculty member, MSU Division of Sports Medicine, Department of Radiology, College of Osteopathic Medicine;
b.     Team Physician, MSU Men's and Women's Gymnastics Teams;
c.     Team Physician, MSU Men's and Women's Track & Field;
d.     Medical Consultant, MSU Wharton Center for the Performing Arts; and
e.     Advisor, Student Osteopathic Association of Sports Medicine.

83.     As a faculty member for the MSU Division of Sport Medicine, Nassar served as a clinician and provided medical services to patients of the MSU Sport Medicine Clinic.

84.     As an MSU employee and agent, Nassar maintained an office at MSU in East Lansing, Michigan, and practiced osteopathic medicine at MSU's Sports Medicine Clinic.

**B.     Nassar's "Treatments" Violated Occupational Health Standards and Were Inconsistent with his Training.**

85.     As a physician of osteopathic medicine, Nassar's medical care and treatment should have consisted largely of osteopathic adjustments and kinesiological treatment of patients.

86.     During his employment, agency and representation with the MSU s, Nassar sexually assaulted, abused and molested multiple girls and women, including Plaintiff, by engaging in nonconsensual sexual touching, assault, and harassment, including but not limited to ungloved, digital vaginal penetration.

87.     The State of Michigan's Department of Licensing and Regulatory Affairs Occupational Health Standards regarding Blood borne Infectious Diseases mandates use of gloves when exposed to potentially infectious material, including vaginal secretions.

88.     Nassar is not and has never been a medical doctor of obstetrics or gynecology ("OB/GYN").

89.     Nassar is not and has never been trained or certified as a pelvic floor therapist.

**C.     Defendants Dismissed Early Reports of Abuse, thereby Allowing
Defendant Nassar to Continue Abusing and Sexually Assaulting
Patients and Athletes Entrusted to his Care for Nineteen More
Years.**

90.     In late 1997 to mid-1998, a 16- or 17-year-old gymnast Larissa Boyce
was injured at a Michigan State youth gymnastics program and informed coach
Kathie Klages that Nassar sexual abused her during his treatment of her injuries.

91.     In her capacity as an employee of Defendants and supervisor of this
youth gymnastics program, Klages had a duty to ensure safe conditions in the
facilities, coaching, and training care provided to the participants.

92.     Boyce informed Klages that Nassar had digitally penetrated her
vagina during the treatment he provided under the auspices of this youth
gymnastics program.

93.     Klages responded "that [Boyce] must be misunderstanding what was
going on."

94.     Klages discouraged Boyce from filing a complaint because it would
have serious consequences for her and Nassar.

95.     Klages informed Nassar of the conversation and at Boyce's next
appointment, Nassar told Boyce that she "was not understanding a proper medical
treatment."

16

96.     After this incident, Klages asked another young gymnast [Pl Jane B8 Doe in 3d Amended Complaint] if Nassar had performed the procedure that involved digital vaginal and anal penetration and she responded that he had.

97.     Klages told this woman not to further raise the subject or report Nassar's conduct.

98.     In 1999, Christie Achenbach, a member of the MSU women's cross country team, reported to MSU Track & Field Head Coach Kelli Bert and multiple team trainers, that Nassar sexually assaulted her during a treatment for a sore hamstring.

99.     As employees of Defendants, Bert and the team trainers had a duty to ensure the safe conditions in the facilities, coaching, and training care provided to the student athletes in their charge.

100.    Bert and the trainers told Achenbach that "she must be wrong."

101.    Bert and the trainers told Achenbach that she was lucky to be treated by Nassar because he's an Olympic doctor and "knew what he was doing."

102.    Bert and the trainers did not report this student athlete's complaints to their supervisors or to any officials designated by Defendants to investigate accusations of sexual harassment and assault that take place at MSU.

103.   In 2000, after Nassar sexually assaulted her during a "treatment," MSU Softball team member Tiffany Thomas Lopez informed three MSU trainers that Nassar was sexually inappropriate during medical treatments.

104.   As employees of Defendants, these trainers had a duty to ensure the safe conditions of the training care provided to the student athletes in their charge.

105.   One of these trainers was Lianna Hadden, who began working for Defendants in 2000 and continues to serve as an athletic trainer there.

106.   Another was Destiny Teachnor-Hauk, who began working as an athletic trainer for Defendants in 1997 and also continues to work as a trainer for MSU athletics.

107.   These trainers dismissed Lopez's concerns and told her she should feel lucky to be treated by a world-renowned doctor.

108.   Lopez informed the trainers that the penetration did not provide relief, but nonetheless they encouraged her not to file a complaint.

109.   These trainers, including Hadden and Teachnor-Hauk, did not report this student athlete's complaints to their supervisors or to any officials designated by Defendants to investigate accusations of sexual harassment and assault that take place at MSU.

110.   In 2001 or 2002, Jennifer Rood Bedford, an MSU Volleyball team member, was sexual assaulted by Nassar and reported the conduct to MSU trainers, including Lianna Hadden.

111.   Bedford states that she and her teammates openly referred to Nassar as the "crotch doc" because of the "treatment" he used that included vaginal penetration.

112.   Hadden and the other trainers, as employees of Defendants, had a duty to ensure the safe conditions of the training care provided to the student athletes in their charge.

113.   The trainers to whom Bedford reported the assault, including Lianna Hadden, dissuaded her from filing a complaint against Nassar.

114.   These trainers, including Hadden, did not report this student athlete's complaints to their supervisors or to any officials designated by Defendants to investigate accusations of sexual harassment and assault that take place at MSU.

115.   In 2004, Dr. Jeffrey Kovan referred a patient to Dr. Nassar for treatment, knowing that Nassar would employ digital penetration of her vagina.

116.   As Director of Sports Medicine for Defendants, Kovan had a duty to ensure that the care provided under his supervision satisfied all licensing and regulatory requirements and satisfied the generally accepted standards of care for Sports Medicine.

117.   Kovan knew that Nassar was committing sexual assaults under the guise of medical treatment, and failed to take steps to prevent these assaults.

118.   Also in 2004, Kyle Stephens, an 11- or 12-year-old girl, told Gary Stollak, a clinical psychologist employed by MSU, that Nassar had been abusing her and sexually assaulting her since age 6.

119.   As a clinician, Stollak had a responsibility to report suspected child abuse to law enforcement, MSU, and/or child protective services.

120.   Instead, Stollak suggested that she and her parents meet with Nassar.

121.   Stollak and the child's parents met with Nassar and Nassar prevailed upon them to drop the matter.

122.   Stephens complained to other counselors later on, but no reports were made.

123.   In 2004, Brianne Randall-Gay, a 16 year old patient of Nassar, reported Nassar's assaults of her to her parents and to the Meridian Township Police.

124.   The Meridian Township Police closed this case without seeking criminal charges or notifying MSU.

125.   Nassar did not notify MSU of this investigation.

126.   In 2004, Nassar authored a chapter in "Principles of Manual Sports Medicine," ed. by Steven J. Karageanes.

20

127.   In this chapter, Nassar described the pelvic diaphragm, coccyx, and sacroiliac ligaments as an area of the body not fully examined due to its proximity to the genitalia and buttocks, and stated it was "referred to as the 'no fly zone' because of the many cultural stigmas in touching this area."

128.   In this chapter, Nassar further wrote that clinicians should take "special measures to explain any examination and techniques applied in this region," and "warning in advance of what you are planning to do," among other suggestions.

129.   Nassar's chapter makes no mention of intravaginal or intra-rectal techniques or procedures.

130.   Nassar did not follow his own recommended best practices in treatments to the pelvic area, as he:

      a.    did not explain any intravaginal techniques to Plaintiffs or their parents;

      b.    did not warn Plaintiffs that he was going to engage in vaginal or anal digital penetration before doing so; and

      c.     did not seek consent from Plaintiffs or their parents before engaging in vaginal or anal digital penetration.

131.   From approximately 2008 to 2009, a woman who worked for the MSU College of Osteopathic Medicine as a simulated patient informed the MSU manager of medical demonstrations, Rebecca Cass that she refused to serve as a simulated patient for Nassar due to his inappropriate comments and touching of her during a demonstration examination to medical students.

21

132.   MSU maintained no record of this simulated patient's complaint.

133.   As an employee of Defendants, the MSU manager had a duty to report this woman's complaints to her supervisor or to any officials designated by Defendants to investigate accusations of sexual harassment and assault that take place at MSU.

134.   This MSU manager failed to report the complaints of this woman working as a simulated patient for proper investigation.

135.   In 2015, Nassar shared with MSU colleague Brooke Lemmen, D.O., that USA Gymnastics ("USAG") had received complaints of sexual assaults and abuse of young gymnasts receiving his "treatment" under its auspices and had terminated its affiliation with Nassar because of these complaints.

136.   As an employee of Defendants and as a medical doctor, Lemmen had a duty to report this information to her supervisor or other officials designated by Defendants to investigate reports that an MSU physician had violated medical ethics and/or generally accepted standards of medical care.

137.   Lemmen did not share her knowledge of the complaints about Nassar with others at MSU.

138.   Pursuant to Michigan State University's Office of Institutional Equity policy, MSU's personnel with knowledge of Nassar's abuse had a duty to take further action, including:

a. "to promptly take steps to investigate or otherwise determine what occurred and then to address instances of relationship violence and sexual misconduct when it knows or should have known about such instances";

b. to inform "the MSU Police of all reports it receives regarding sexual assaults";

c. to "take immediate steps to initiate the investigatory process to determine what happened and to resolve the matter promptly and equitably";

d. to "take prompt, responsive action to support a claimant and … take steps to eliminate, prevent, or address a hostile environment if it determines that one exists";

e. "to conduct a prompt, adequate, reliable, and impartial investigation to determine what occurred and then to take appropriate steps to resolve the situation when it learns of an incident of sexual misconduct;

f. "independently investigate complaints of relationship violence and sexual misconduct";

g. to conduct an investigation "by the Office of Institutional Equity under the direction of the Deputy Title IX Coordinator for Investigations"; and

h. to promptly report allegations of sexual misconduct "to the Office of Institutional Equity."

139. Despite knowledge of sexual abuse, upon information and belief, and in violation of state and federal law, Defendants failed to take any action in response to the above-mentioned complaints.

140. Because MSU took no action to investigate the complaints above complaints and took no meaningful corrective action, from the early 1990s on, under the guise of treatment, multiple girls and women, including Plaintiffs, were sexually assaulted, abused and molested by Nassar, including by nonconsensual vaginal digital penetration, nonconsensual sexual touching of the vaginal and anal

area without the use of gloves or lubricant, and nonconsensual touching and groping of the breasts.

141. Nassar's victims during this period ranged from adults to children as young as eight years old.

### D. MSU Investigates Nassar, Finds Concerns, But Fails to Implement Safeguards.

142. In April of 2014, Amanda Thomashow filed a complaint with the MSU Police alleging abuse during medical treatment.

143. Thomashow claimed that Nassar massaged her breast and buttocks on an intimate way, then massaged her vaginal area and did not stop when she told him it was hurt.

144. Thomashow also reported that Nassar was sexually aroused during the treatment.

145. MSU opened a Title IX investigation and referred the matter to the Ingham County Prosecutor's office.

146. Stuart Dunnings, who was prosecutor at time and since resigned in March 2016 for his own sexual misconduct, was swayed to drop the case after seeing a video demonstrating the procedure's "legitimacy."

147. Strampel initially suspended Nassar during this investigation.

148. However, on June 30, 2014, Strampel gave Nassar permission to return to seeing patients, even though the internal investigation had not yet concluded.

149. MSU investigator Kristine Moore consulted with four "experts" in the course of her investigation into Nassar.

150. The "experts" Moore consulted were all closely tied to Nassar and supported him in the investigation:

    a.    Brooke Lemmen, D.O., was a colleague of Nassar's at the MSU Sports Medicine Clinic and resigned from MSU in mid-January of 2017 in part for pressuring a staff person not to fully cooperate with the internal investigation;

    b.    Destiny Teachnor-Hauk, who had worked with Nassar for 17 years as a MSU athletic trainer, told Moore that she had never had a complaint about Nassar's techniques, even though she had;

    c.    Lisa DeStefano, D.O., was chair of the MSU Osteopathic Manipulative Medicine Department and had been a medical school classmate with Nassar and colleague; and

    d.    Jennifer Gilmore, D.O., who had known Nassar since they were both residents in 1995, and Nassar served as her attending physician during her sport medicine fellowship.

151. On July 28, 2014, the MSU Office of Institutional Equity issued two reports, one shared with the complainant Amanda Thomashow and one shared internally at MSU, including with Nassar and Strampel.

152. Both versions of the July 28, 2014 report stated that the investigation "cannot find that the conduct was of a sexual nature. Thus, it did not violate the

Sexual Harassment Policy. However, we find the claim helpful in that it allows us to examine certain practices at the MSU Sports Medicine Clinic."

153.   The version of the report that investigator Kristine Moore produced for MSU that was not provided to Amanda Thomashow contained the following conclusion:

> We cannot find that the conduct was of a sexual nature. Thus, it did not violate the Sexual Harassment Policy. However, we find the claim helpful in that it brought to light some significant problems that the practice will want to address.

> We find that whether medically sound or not, the failure to adequately explain procedures such as these invasive, sensitive procedures, is opening the practice up to liability and is exposing patients to unnecessary trauma based on the possibility of perceived inappropriate sexual misconduct. In addition, we find that the failure to obtain consent from patients prior to the procedure is likewise exposing the practice to liability. If procedures can be performed skin-on-skin or over clothes in the breast or pelvic floor area, it would seem patients should have the choice between the two. Having a resident, nurse or someone in room during a sensitive procedure protects doctors and provides patients with peace of mind. If "touching is what DO's do" and that is not commonly known, perhaps the practice will want to consider a disclaimer or information sheet with that information provided to the patient up front.

> Finally, we believe the practice should consider whether its procedure for intake of complaints about physicians' behavior is adequate. Ms. Thomashow claims she tried to file a complaint with the front desk receptionist, telling her that she was cancelling her appointment because she felt "violated." Whether this triggers a reporting protocol should be examined by the practice.

154.   MSU dismissed Thomashow's complaint, stating that she didn't understand the "nuanced difference" between sexual assault and an appropriate

medical procedure. MSU determined that Nassar's conduct was "medically appropriate" and "[n]ot of a sexual nature."

155. Amanda Thomashow reported to MSU that its investigation report by Kristine Moore omitted or withheld the following facts:

    a.    Nassar was sexually aroused when he assaulted her; and

    b.    Nassar did not end the assault until Thomashow forcibly removed his hand from her.

156. As a result of this investigation, MSU claimed that it established protocols for intravaginal procedures for Nassar.

157. On July 30, 2014, Strampel emailed Nassar confirming new institutional protocols in writing:

    a.    Having another person (resident, nurse, etc.) in the room whenever approaching a patient to perform procedures close to a sensitive area;

    b.    The procedure that led to the complaint would be modified to be sure that there is little to no skin-to-skin contact when in "these regions." Should the procedure be absolutely necessary, the procedure would be explained in detail with another person in the room for both the explanation and the procedure; and

    c.    New people in the practice will be oriented to be sure they understand these requirements.

158. At approximately the same time, Strampel sent the same email to MSU's Title IX office indicating that he would enforce these protocols on Nassar.

159. Strampel also sent a copy of this email to Dietzel, who along with Kovan, acted in a supervisory role to Nassar.

160.   However, Strampel did not enforce these protocols and he did not alert other Clinic employees about their existence and applicability to Nassar.

161.   Strampel admitted to Detective Sergeant Christopher Rozman of the MSU Police on March 14, 2017, that the institutional restrictions and guidelines for Nassar were not shared beyond Dietzel and that Strampel took no action to ensure that they were implemented, followed, or enforced.

162.   Strampel further admitted to Det. Sgt. Rozman that he did not wish for other employees of the Sports Medicine Cline to know of the accusations against Nassar or that Nassar was subject to restrictions or guidelines.

163.   Strampel further admitted to Det. Sgt. Rozman that he took no steps to orient or instruct any MSU employees regarding the restrictions or guidelines outlined in the July 30, 2014 email.

164.   In 2016, a registered nurse who was the only registered nurse at the MSU Sports Medicine Clinic at the time also has stated that she was never made aware of any restrictions or guidelines regarding Nassar.

165.   On August 30, 2016, MSU suspended Nassar from clinical and patient duties upon receipt of a Criminal complaint.

166.   In September of 2016, MSU finally terminated Nassar's employment in the wake of criminal investigations regarding his sexual assault of minors and possession of child pornography.

28

167. The reasons Defendants provided for Nassar's termination were not limited to:

    a.    Deviation from "required best practices put in place following the internal sexual harassment investigation conducted … in 2014;"

    b.    Failure to disclose a 2004 complaint to Meridian Township Police; and,

    c.    Dishonesty by Nassar when MSU questioned him about receiving prior complaints about the "procedure" at issue.

168. Shortly after Nassar was fired, Klages requested MSU Women's Gymnastics Team members to sign a card to show their support for Nassar.

169. At the time Klages had her team members sign this card, she knew that Nassar had been terminated because of numerous claims of sexual assault against patients and athletes.

170. Despite terminating Nassar's employment in September of 2016 for sexual assault of patients and athletes, MSU did not encourage members of the Women's Gymnastics Team to report suspected abuse until February of 2017.

171. On March 15, 2017, Teachnor-Hauk made statements to MSP Police Department Detective Lieutenant Andrea Munford, Det. Sgt. Rozman, and FBI Special Agent Rodney Charles that she had never had an athlete tell her that Nassar made them uncomfortable or that Nassar had performed digital vaginal penetration.

172. Teachnor-Hauk's statement was false, because numerous athletes had reported their discomfort with Nassar and that he had performed digital vaginal penetration on them, including a report in 1999-2000.

173.   On January 24, 2018, Simon resigned as President of MSU.

174.   On January 26, 2018, Hollis resigned as Athletic Director of MSU.

175.   On February 9, 2018, Defendants initiated steps to revoke Strampel's tenure and terminate his employment, stating "Strampel did not act with the level of professionalism we expect from individuals who hold senior leadership positions, particularly in a position that involves student and patient safety . . . . Further allegations have arisen that question whether his person conduct over a long period of time met MSU's standards."

### E.   Nassar is Finally Stopped by Criminal Complaints and Proceedings.

176.   In mid-August of 2016, Rachel Denhollander filed a criminal complaint with MSU Police, alleging Nassar sexually assaulted her when she was a 15-year-old club-level gymnast in 2000.

177.   On September 8, 2016, Jane JD Doe filed a lawsuit in the Sacramento, CA Superior Court against Nassar and USAG.

178.   On September 25, 2016, IndyStar reported that 16 more women had filed criminal complaints.

179.   On November 22, 2016, Nassar was charged in Ingham County, Michigan with three first-degree sexual assault charges related to abuse of a person under 13.

180. On December 16, 2016, Nassar was indicted on federal child pornography charges in W.D. Mich.

181. On December 21, 2016, an FBI agent testified that Nassar had at one point used a GoPro camera to record video images of children in a swimming pool and that:

a.    Nassar's hand can be seen grabbing one girl's hand and shoving it into the vaginal area of another girl; and,
b.    Nassar's thumb can be seen pressing into a child's vagina/vaginal area.

182. On February 7, 2017, a superseding indictment in the Federal case against Nassar added an additional count of "Destruction and Concealment of Records and Tangible Objects" alleging between September 19, 2016 and September 20, 2016, Nassar "caused a third-party vendor to permanently delete and destroy all images, records, documents, and files contained on the hard drive of a laptop computer, and the threw in the trash a number of external hard drives."

183. On July 11, 2017, Nassar pleaded guilty to three counts:

a.    Receipt and Attempted Receipt of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A);
b.    Possession of Child Pornography, in violation of 18 U.S.C. § 48 2252A(a)(5)(B); and
c.    Destruction and Concealment of Records and Tangible Objects, in violation of 18 U.S.C. § 1519.

184. On December 7, 2017, Nassar was sentenced in federal court to three consecutive 20-year sentences.

185.   On February 17, 2017, Nassar was ordered to stand trial in Ingham County on three counts of first-degree criminal sexual conduct with a person under 13.

186.   On February 22, 2017, Nassar was arraigned in Ingham County, Michigan and Eaton County Michigan on 22 counts of first-degree sexual conduct with a person under 13 years old and 14 counts of third-degree criminal sexual assault with a person under the age of 13 years old.

187.   On November 11, 2017, Nassar pleaded guilty to seven counts of criminal sexual assault in Ingham County,

188.   In November of 2017, Nassar pleaded guilty to three counts of criminal sexual assault in Eaton County.

189.   On January 24, 2018, Nassar was sentenced in Ingham County Court to 40-175 years.

190.   On February 5, 2018, Nassar was sentenced in Eaton County Circuit Court to serve 40-125 years.

191.   Between the Ingham and Eaton County hearings, approximately 204 victims gave victim impact statements over nine days.

## V.    SPECIFIC ALLEGATIONS: PLAINTIFF S.M. DOE

192.   Plaintiff grew up in Sarnia, Canada, where she began gymnastics at around the age of 8.

32

193.   At a young age Plaintiff showed talent as a gymnast and trained hard as a child and youth.

194.   From a young age, Plaintiff was taught to strictly obey authority, including doctors, without question and without complaint, regardless of the severity of pain, abuse and discomfort  she experienced.

195.   Although she was successful, Plaintiff felt her coaches in Sarnia did not believe she could become an elite gymnast.

196.   Plaintiff was recruited by Central Michigan University ("CMU"), to attend the university with a full scholarship for gymnastics.

197.   Plaintiff felt the CMU gymnastics coaches believed in her, and she vowed to put in whatever time and effort that was necessary to become a successful gymnast.

198.   The years of hard physical training took its toll on Plaintiff causing her to suffer from near constant back pain.

199.   Nevertheless, determined to excel as a college gymnast, Plaintiff matriculated to CMU in the fall of 1994. Plaintiff was a minor.

200.   Because the gymnastics team begins practice in August, Plaintiff believes she arrived at CMU in August of 1994.

201.   During training, Plaintiff communicated her back discomfort to a trainer or coach.

202.   By this time, Defendant Nassar had established himself as a renowned gymnastics  physician and was associated with U.S.A. Gymnastics.

203.   By 1993, Defendant Nassar received an osteopathic medical degree from Michigan State University.

204.   Between 1993 and 1997, Nassar completed his medical residency at St. Lawrence Hospital in Lansing, Michigan. During this time he was associated with and worked for the MSU Sports Medicine Clinic.

205.   In the autumn of 1994, Plaintiff was approached by her coach, Jerry Reighard, who suggested she see Defendant Nassar to obtain relief for her back pain.

206.   An appointment was set up for Plaintiff to see Defendant Nassar.

207.   Plaintiff traveled from Mt. Pleasant to East Lansing after gymnastics practice, which ended at 6 p.m.

208.   Plaintiff saw Defendant Nassar in a building on the campus of MSU. It was in the evening. Plaintiff was alone with Defendant Nassar.

209.   Defendant Nassar told Plaintiff he could release her ligaments and tendons through massage.

210.   Defendant Nassar massaged Plaintiff's hamstrings and thighs.

211.   Defendant Nassar next stated that he would do a procedure on Plaintiff to help release her back muscles.

212. Defendant Nassar further stated the procedure would be "uncomfortable" but that it was the best way to release the tension in Plaintiff's lower back.

213. During this procedure Plaintiff was clothed in a shirt, shorts, and underwear.

214. The underwear had a strip of material covering Plaintiff's vaginal area.

215. Defendant Nassar moved the strip of material covering Plaintiff's vaginal area.

216. Defendant Nassar then inserted an ungloved finger into Plaintiff's vagina.

217. Defendant Nassar massaged Plaintiff's inter vagina with his ungloved finger.

218. Plaintiff, a minor, believed she was undergoing an established medical procedure by a renowned sports medicine physician.

219. Plaintiff continued to treat with Defendant Nassar throughout her four years at CMU.

220. Plaintiff saw Defendant Nassar dozens of times.

221. On almost every occasion Plaintiff was sexually assaulted by Defendant Nassar in the  manner described above.

222.   During her sophomore year at CMU (1995-1996), Plaintiff was assaulted in a different manner by Defendant Nassar.

223.   Defendant Nassar instructed Plaintiff to lie flat on her stomach.

224.   Defendant Nassar used his forearm and elbow to release her hamstring muscles.

225.   Plaintiff briefly dozed off during the massage, but was awakened by an unfamiliar sensation.

226.   Plaintiff felt Defendant Nassar rubbing his naked penis over her legs. She startled awake.

227.   Defendant Nassar noticed Plaintiff had awakened, and said tersely, "Session over."

228.   Plaintiff graduated from CMU in 1998.

229.   In her gymnastics career at CMU Plaintiff earned All-MAC honors as a freshman, helped the team win league titles in 1995 and 1998, was an NCAA regional qualifier in 1997 and was a four time member of the National Associates of College Gymnastics Coaches All-Academic team.

230.   Plaintiff was inducted into the CMU Gymnastics Hall of Fame.

231.   Plaintiff continued into graduate school and obtained a degree in Nuclear Pharmacy. She is currently a practicing pharmacist.

232. On August 4, 2016 the Indianapolis Star published an Article "How U.S.A. Gymnastics Failed to Report Cases."

233. On September 12, 2016, the Indianapolis Star published its first report on Defendant Nassar.

234. On November 22, 2016 child sex abuse charges were filed against Defendant Nassar.

235. Plaintiff did not know, until the Nassar story broke, which was no earlier than the first published report in August or September of 2016, that Nassar had sexually assaulted her from 1994 to 1998.

236. Plaintiff was dumbfounded, shocked, sickened, saddened, humiliated and embarrassed when she learned the truth about what had been done to her.

237. Plaintiff's parents, husband and friends all asked if she had been assaulted by Defendant Nassar.

238. To each and every question, Plaintiff denied being victim of Defendant Nassar.

239. Plaintiff's husband stated to her that he found it hard to believe the victims hadn't known something was wrong.

240. This statement, made unknowingly by Plaintiff's husband caused her further shame and humiliation.

241. Plaintiff thereafter vowed never to tell anyone what happened to her.

242.   Plaintiff suffered silently and alone from 2016 to 2018 with the knowledge that Defendant Nassar had sexually assaulted her.

243.   On July 18, 2018, the Espy Sports Awards presentation was televised nationally.

244.   The Arthur Ashe Courage Award for 2018 was given the victims of Defendant Nassar, in honor of their bravery in coming forward and speaking about their abuse by Nassar.

245.   In that televised program Olympic Gymnast Ally Raisman stated, "Too often abusers and enablers perpetuate suffering by making survivors feel their truth doesn't matter. To all the survivors out there, don't let anyone rewrite your story. Your truth does matter. You matter. And you are not alone."

246.   Plaintiff listened to Ms. Raisman and decided she must speak up about what had happened to her.

247.   Plaintiff finally, and tearfully, explained to her husband that she had been a Nassar victim.

**CLAIMS AGAINST MICHIGAN STATE UNIVERSITY DEFENDANTS AND LAWRENCE NASSAR**

**COUNT I**
**Violation of Civil Rights, 42 U.S.C. § 1983**

248.   Plaintiff restates and incorporates here all previously stated allegations.

38

249. Plaintiff, as a female, was a member of a protected class under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

250. Plaintiff also enjoys the constitutionally protected substantive due process right to be free from the invasion of bodily integrity through sexual assault, abuse, or molestation under the Fourteenth Amendment to the United States Constitution.

251. At all relevant times, MSU Defendants were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendant Michigan State University

252. The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, including the right to be free from sexual assault, of which reasonable persons in their positions should have known.

253. At all relevant times, MSU Defendants had the ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives, in the appropriate manner of detecting, reporting, and preventing sexual abuse, assault, and molestation and as a matter of acts, custom, policy, and/or practice, failed to do so with deliberate indifference.

254. At all relevant times, MSU Defendants acted in a supervisory role to Defendant Nassar through their roles at Defendant MSU's Sports Medicine Clinic,

MSU's College of Osteopathic Medicine, and other affiliated MSU departments or institutions.

255.   As a matter of custom, policy, and/or practice, MSU Defendants had and have the ultimate responsibility and authority to investigate complaints against their employees, agents, and representatives from all individuals including, but not limited to students, patients, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

256.   Defendant MSU's internal policies provide that "[a]ll University employees ... are expected to promptly report sexual misconduct or relationship violence that they observe or learn about and that involves a member of the University community (faculty, staff or student) or occurred at a University event or on University property." They state further: "[t]he employee must report all relevant details about the alleged relationship violence or sexual misconduct that occurred on campus or at a campus-sponsored event.

257.   MSU Defendants further violated the aforementioned internal policies in 1997/1998, 2000, 2001/2002, 2004, and 2014 when other athlete-patients told MSU Defendants that they had been sexually assaulted by Defendant Nassar, and MSU Defendants refused to report the incident and instead intimidated, humiliated, and embarrassed them.

258.   MSU Defendants violated the policy by refusing to take any action in response to legitimate and credible claims of sexual assault by resulted in Plaintiff's continued violations of their constitutional rights, including her Due Process right to bodily integrity, which includes the right to be free from sexual assaults.

259.   MSU Defendants' actions as alleged above also demonstrate the existence of an agreement or conspiracy between Defendant Nassar and Defendant Klages to deprive Plaintiff, along with numerous other athlete-patients, of their constitutional rights.

260.   Ultimately MSU Defendants failed to adequately and properly investigate the complaints of similarly situated individuals to Plaintiff including but not limited to failing to:

a.     Perform a thorough investigation into improper conduct by Defendant Nassar after receiving complaints in 1997/1998,

b.     Thoroughly review and investigate all policies, practices, procedures, and training materials related to the circumstances surrounding the conduct of Defendant Nassar;

261.   As indicated in the U.S. Department of Education Office of Civil Rights report, the MSU Defendants had a culture that permitted a sexually hostile

environment to exist affecting numerous individuals on Defendant MSU's campus, including Plaintiffs.

262.   Also indicated in the report was MSU Defendants' custom, practice, and/or policy of failing to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner which caused and may have contributed to a continuation of the sexually hostile environment.

263.   By failing to prevent the aforementioned sexual assault, abuse, and molestation upon Plaintiff, and by failing to appropriately respond to reports of Defendant Nassar's sexual assault, abuse, and molestation that was so clearly unreasonable that it amounted to gross negligence and deliberate indifference, MSU Defendants are liable to Plaintiffs pursuant to 42 U.S.C. § 1983.

264.   MSU Defendants are also liable to Plaintiff under 42 U.S.C. § 1983 for maintaining customs, policies, and practices which deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution, including Plaintiffs' constitutional right to bodily integrity.

265.   MSU Defendants tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline Defendant Nassar, with the result that Defendant Nassar was allowed to violate the constitutional rights of persons such as Plaintiff with impunity.

266.  As a direct and proximate result of the unconstitutional acts of Defendants as alleged in this complaint, Plaintiff has experienced serious and irreversible psychological damage; Plaintiff has and will incur substantial economic losses in the nature of medical expenses and lost wages; Plaintiff is entitled to an award of non-economic damages in the nature of pain and suffering, embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms such as sleepiness, anxiety and symptoms similar to post-traumatic syndrome.

267.  In the alternative, the actions or inactions of Defendants were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## COUNT II
### Failure to Train and Supervise, 42 U.S.C. § 1983

268.   Plaintiff restates and incorporates here all previously stated allegations.

269.   MSU Defendants have the ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives including Defendant Nassar and all faculty and staff regarding their duties toward athletes, students, faculty, staff, and visitors.

270.   MSU Defendants failed to train and supervise their employees, agents, and/or representatives including all faculty and staff, regarding the following duties:

    a.  Perceive, report, and stop inappropriate sexual conduct on campus;
    b.  Provide diligent supervision over student-athletes and other individuals;
    c.  Report suspected incidents of sexual abuse or sexual assault;
    d.  Ensure the safety of all students, faculty, staff, and visitors to Defendant MSU's campuses premises;
    e.  Provide a safe environment for all students, faculty, staff, and visitors to Defendant MSU's premises free from sexual harassment; and,
    f.  Properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

271.   The above list of duties is not exhaustive.

272.   MSU Defendants failed to adequately train coaches, trainers, medical staff, and others regarding the aforementioned duties which led to violations of Plaintiff's rights.

44

273.  As a result, MSU Defendants deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

274.  As a direct and/or proximate result of MSU Defendants' actions and/or inactions, Plaintiff has suffered and continues to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

In the alternative, the actions or inaction of the MSU Defendants were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in

physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity

## COUNT III
### Sex Discrimination, 42 U.S.C. § 18116 (Patient Protection and Affordable Care Act §1557)

275. Plaintiff restates and incorporates here all previously stated allegations.

276. Section 1557 of the Patient Protection and Affordable Care Act, which is codified at 42 U.S.C. § 18116, provides that:

> Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under . . . title IX shall apply for purposes of violations of this subsection.

277. Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* prohibits sex discrimination in programs that receive federal financial assistance.

46

278.   Plaintiff, as a female, has a right under 42 U.S.C. § 18116 to receive health care services free from discrimination on the basis of sex.

279.   Plaintiff is an "individual" within the meaning of 42 U.S.C. § 18116.

280.   MSU Defendants receive Federal financial assistance within the meaning of 42 U.S.C. § 18116 because they receive federal financial assistance such as credits, subsidies, or contracts of insurance.

281.   MSU Defendants employed the services of Defendant Nassar, doctors, and other professional and non-professional health care providers who cared for Plaintiffs and held themselves out to the public as competent, careful, and experienced in the care and treatment of patients.

282.   Plaintiff sought medical care from Defendant Nassar at the MSU Sports Medicine Clinic for her back pain as identified in her specific allegations.

283.   Plaintiff expected to receive medical care for her injury without being sexually assaulted and without fear of sexual harassment or assault.

284.   Defendant Nassar's conduct and actions toward Plaintiff, that being nonconsensual and assaultive digital vaginal penetration, and rubbing his naked penis on her legs constitutes sex discrimination under 42 U.S.C. § 18116, and otherwise denied Plaintiff the benefits of appropriate medical care.

285.   MSU Defendants knew or should have known of Nassar's abuse yet failed to take corrective action.

286.  MSU Defendants are vicariously and/or contractually liable for the actions of its principals, employees, agents, and representatives.

287.  MSU Defendants supervised Nassar and/or were in a position to take appropriate action upon learning of concerns of misconduct as early as 1997.

288.  MSU Defendants are directly liable for their failure to train, educate, and supervise.

289.  MSU Defendants failed to properly train and supervise Nassar related to his treatment of Plaintiff and with respect to promulgating and enforcing policies and procedures related to patient safety (*e.g.* use of gloves; consent; chaperones, etc.).

290.  Because of Defendants' inaction and deliberate indifference, Defendants forced Plaintiff to endure unnecessary pain, trauma, humiliation, and duress.

291.  Because of Plaintiff's sex, Defendants treated Plaintiff with a lack of care, dignity, and respect.

292.  The conduct of MSU Defendants described above constitutes sex discrimination against Plaintiff.

293.  MSU Defendants perpetrated this discrimination with malice, deliberate disregard for, or deliberate or reckless indifference to Plaintiff's rights.

294. MSU Defendants' failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after they received repeated notice of Defendant Nassar's wrongdoing subjected Plaintiff and countless others to further sexual harassment and sexual assaults as well as a sexually hostile environment—effectively denying them all access to any health program or activity at MSU and effectively denying them the benefits of appropriate medical care.

295. As a direct and proximate result of the unconstitutional acts of Defendants as alleged in this complaint, Plaintiff has suffered and continues to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and loss of enjoyment of life, was prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity.

296. In the alternative, the actions or inactions of MSU Defendants were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical

manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## VI.   RELIEF REQUESTED

Plaintiff requests that the Court enter an order granting Plaintiff all available relief and  remedies allowable under the law, including but not limited to:

    a.    Compensatory damages in an amount to be determined as fair and just under the circumstances, by the trier of fact including, but not limited to medical expenses, loss of earnings, mental anguish, anxiety, humiliation, and embarrassment, violation of Plaintiff's Constitutional, Federal, and State rights, loss of social pleasure and enjoyment, and other damages to be proved;;

    b.    Punitive and/or exemplary damages in an amount to be determined as reasonable or just by the trier of fact;

    c.    Reasonable attorney fees, costs and interest; and

    d.    Other declaratory, equitable, and/or injunctive relief, including, but not limited to implementation of institutional reform and measures of accountability to ensure the safety and protection of young athletes and other individuals, as appears to be reasonable and just.

DEBORAH GORDON LAW
/s/Deborah L. Gordon (P27058)
Attorney for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500/ FAX (248) 258-7881
dgordon@deborahgordonlaw.com

Dated:  September 7, 2018

## JURY DEMAND

Plaintiff, by her attorneys **Deborah Gordon Law**, hereby demand a trial by jury of all the issues in this cause.

DEBORAH GORDON LAW
/s/Deborah L. Gordon (P27058)
Attorney for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500/ FAX (248) 258-7881
dgordon@deborahgordonlaw.com

Dated:  September 7, 2018